PINILISHALPERN, LLP
William J. Pinilis (024721992)
160 Morris Street
Morristown, NJ  07960
Tel: (973) 401-1111/Fax: (973) 401-1114
Attorney for Plaintiff
File No.:  12362

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

MICHAEL BRADY,

Plaintiffs,

v.

OFFICE OF THE COUNTY
PROSECUTOR, COUNTY OF
BERGEN, JOHN L. MOLINELLI,
ESQ., COUNTY OF BERGEN, STATE
OF NEW JERSEY, OFFICE OF THE
ATTORNEY GENERAL, JOHN DOES
1-10 AND ABC CORPORATIONS 1-
10,

Defendants.

Civil Action No.:

COMPLAINT AND JURY DEMAND

---

Plaintiff, Michael Brady by way of Complaint against Defendants, Office of The County

Prosecutor, County of Bergen, John L. Molinelli, Esq., County of Bergen, State of New Jersey,

Office of The Attorney General, John Does 1-10 and ABC Corporations 1-10, alleges as follows:

## PARTIES

1.      Plaintiff, Michael Brady, is an adult individual residing at 101 Shepard Avenue,

Teaneck, New Jersey 07666.

2.      Defendant, Office of the County Prosecutor, County of Bergen is a governmental

agency doing business at Justice Center, 10 Main Street, Hackensack, New Jersey 07601.

3.      Defendant, the County of Bergen, State of New Jersey, is a municipal entity and political subdivision of the State of New Jersey having its principal place of business at One Bergen County Plaza, Hackensack, New Jersey 07601.

4.      Defendant, John L. Molinelli, Esq., is and at all times relevant hereto was the Bergen County Prosecutor ultimately responsible for the prosecution of Plaintiff for homicide as set forth below.

5.      Defendant, State of New Jersey, is a governmental entity doing business at 225 West State Street, P.O. Box 300, Trenton, New Jersey 08625.

6.      Defendant, the Office of Attorney General, is a governmental agency doing business at Hughes Justice Complex, 25 West Market Street, P.O. Box 080, Trenton, NJ 08625.

7.      Defendants, John Doe 1-10 are fictitious names for individuals and/or entities currently unknown to Plaintiff, but who can be more specifically described as individuals responsible for the unlawful, malicious, and frivolous prosecution of Plaintiff for homicide as set forth below.

8.      Defendants, ABC Corporations 1-10 are fictitious names for entities currently unknown to Plaintiff, but who can be more specifically described as individuals responsible for the unlawful, malicious, and frivolous prosecution of Plaintiff for homicide as set forth below.

## JURISDICTION AND VENUE

9.      This Court has Federal Question Jurisdiction pursuant to 28 U.S.C. § 1331; and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

10.     Venue is proper in this district in that the events giving rise to this claim occurred in this district, Defendants all reside in this district, and/or maintain a principal place of business in this district.

## FACTUAL BACKGROUND MATERIAL TO ALL COUNTS

11.    On or about January 30, 2013, Tam Marie Pitts-Gaddy (hereafter referred to as "Ms. Pitts-Gaddy") and her then 10-year-old daughter, Natasha, were murdered at their home in Englewood, New Jersey.

12.    Plaintiff, Michael Brady, at one time had a romantic relationship with Ms. Pitts-Gaddy, and the two resided together (with Natasha) until their romantic relationship terminated.

13.    After the termination of their romantic relationship, and after Brady moved out of their home, Brady remained exceedingly close with both Ms. Pitts-Gaddy and especially Natasha. In fact, Plaintiff remained in daily contact with Ms. Pitts-Gaddy and Natasia until the time of their death.

14.    On or about January 30, 2013, Plaintiff went to the home of Pitts-Gaddy and Natasia because Ms. Pitts-Gaddy had not returned a number of his telephone calls. Given their close relationship, it was exceedingly unusual for Ms. Pitts-Gaddy not to return Plaintiff's calls for an extended time. When Mr. Brady arrived at the house, nobody answered the door. Even though nobody answered the door, it seemed to Mr. Brady that Pitts-Gaddy and Natasia were home. Because he was concerned, Brady broke into the home through a window. A neighbor witnessed Brady breaking in and contacted the police.

15.    When Brady entered Pitts-Gaddy's home, he discovered Ms. Pitts-Gaddy's body. Ms. Pitts-Gaddy had been stabbed to death. There was blood and other evidence of the stabbing throughout the home.

16.    Shortly after Plaintiff discovered Ms. Pitts-Gaddy's body, police arrived at the scene. Needless to say, what was suspected to be a burglary call immediately became a homicide

investigation. In addition to Pitts-Gaddy's body, the police discovered Natasha's body in the basement of the home. Natasia had been suffocated.

17.     The police arrested Plaintiff, and took him into custody.

18.     That same day, the Defendants charged Plaintiff with, among other charges, homicide pursuant to N.J.S.A. 2C:11-3a (1)(2).

19.     On February 1, 2013, Plaintiff pleaded not guilty. The Court set bail at $2 million. Plaintiff, who was a custodian at Leonia Middle School was unable to make bail.

20.     Plaintiff remained in prison until that matter was tried — four years later.

21.     The fact that the matter was tried, and that the charges against Plaintiff were not dismissed, is remarkable and outrageous. The Defendants ignored significant exculpatory evidence showing clearly that the crime was not committed by Plaintiff.

22.     Among other things, Defendants retained a former special agent of the Federal Bureau of Investigation (the "FBI") as an expert in the field of foot impression evidence. The Defendants retained the expert because there were bloody footprints at the crime scene. The expert retained by Defendants was specifically recommended by the FBI.

23.     Defendants' expert conducted an investigation as to whether bloody footprints found at the scene of the crime belonged to Plaintiff. Following his investigation, the expert concluded that the foot prints had a "high level of association with the left foot exemplars of Daquan Frasier . . . ," and that "the left foot impression . . . is significantly different than the left foot exemplars of Michael Brady . . . ."

24.     Upon information and belief, Daquan Frasier is an individual who also had a prior relationship with Ms. Pitts-Gaddy. Indeed, the then 19-year old Mr. Frasier lived with Ms. Pitts-Gaddy (his aunt) until she locked him out of her home and threw his clothing outside. Mr. Frasier

had a notable criminal record at the time including convictions for armed robbery, weapons possession, and possession of controlled dangerous substances. The Defendants' expert took impressions of Mr. Frasier's feet in connection with his investigation. At the time that the expert took impressions of Daquan Frasier's feet, Mr. Frasier was incarcerated at the Yardville Correctional Center in Yardville, New Jersey upon an October 2013 conviction for possession of firearms for unlawful purposes, and unlawful possession of a handgun. Upon information and belief, Mr. Frasier was not incarcerated at the time of Ms. Pitts-Gaddy's murder.

25.     Finally, a bottle of 409 cleaner allegedly used to try and clean up blood from the murders was found at Ms. Pitts-Gaddy's home. The cleaner had Frasier's fingerprints on the trigger of the bottle.

26.     Not only did Defendants ignore the opinion of their own expert, the prosecution neglected to test DNA from a hair sample found in the left hand of Ms. Pitts-Gaddy's body at the crime scene. The failure to test this critical piece of evidence is inexplicable — especially considering the fact that Defendants' own expert opined that the foot prints were not Plaintiff's.

27.     The fact that four-years elapsed while Plaintiff was incarcerated and waiting for trial is likewise inexplicable. Notwithstanding Plaintiff's constitutional right to a speedy trial, and that he could not raise the $2 million bail, the prosecution requested repeated trial adjournments. As a result, Plaintiff waited in prison for four-years until the matter was finally tried to a jury.

28. The trial took more than 30 days. The prosecution called more than 30 witnesses, and summed up before the jury for more than two hours. The defense called exactly no witnesses. In only 90 minutes, on September 6, 2017 the jury acquitted Plaintiff of all charges against him.

29. While the Plaintiff was grateful that the jury exonerated him and recognized that there was no basis for the charges against him, the Defendants' lack of good-faith, and its malicious,

and baseless prosecution of the Plaintiff deprived him of four-years of his life, and caused Plaintiff lasting and permanent emotional trauma and injury.

## COUNT ONE
### (For Depravation of Civil Rights (42 U.S.C. § 1983 *et seq.*))

30.     As a direct result of Brady's arrest, Brady has suffered embarrassment, humiliation, and severe and permeant mental anguish, to his great damage and loss.

31.     Defendants, knowingly engaged in a conspiracy to falsely imprison and maliciously prosecute Plaintiff.

32.     Defendants knowingly and intentionally imprisoned Plaintiff wrongfully. The result of the intentional, malicious, and frivolous prosecution was that Plaintiff was severely damaged. Defendants prosecuted Plaintiff for a double homicide when they knew that there was not a sufficient basis to support such charges and imprisonment.

33.     As set forth above, and among other things, Defendants ignored the opinion of their own expert that bloody footprints at the scene of the murders did not belong to Plaintiff. Defendants also ignored DNA evidence in the hand of the victim. Defendants also unreasonably delayed their investigation, and the trial which served to cause Plaintiff an extended incarceration in violation of his Constitutional rights to a speedy trial. These delays were part of a thinly-veiled strategy to "wear Plaintiff down," and make him feel desperate and hopeless so as to extort a plea agreement from Plaintiff. To Plaintiff's great credit and because he knew he was innocent, Plaintiff did not relent and was ultimately acquitted.

34.     As a direct result of Defendants' intentional, willful and negligent violations of Brady's rights under 42 U.S.C.A. §§ 1983 and 1985 in the nature of violations of First, Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States, and state common-law rights protecting him against false arrest, false imprisonment, malicious prosecution, abuse of

process, assault and battery, intentional infliction of emotional distress, and negligent infliction of emotional distress, committed by the Defendants, the Defendants are subject to damages, including compensatory and punitive damages.

## COUNT TWO
### (For Malicious Prosecution/Wrongful Imprisonment/False Arrest and Intended Infliction of Emotional Distress)

35.    Plaintiff repeats the foregoing statements as if set forth at length.

36.    At the time of Defendants' investigation, arrest, and imprisonment of the Plaintiff, the Plaintiff had not committed any infraction, and there was not proper cause to justify Plaintiff's incarceration and/or trial. For certain, after Plaintiff's arrest there was not proper cause to continue to imprison and prosecute Plaintiff.

37.    Defendants' actions stated above, *inter alia*, were committed under the color of state law and were violations of Plaintiff's clearly established and well settled Constitutional and other legal rights.

38.    Defendants caused Plaintiff to suffer a malicious prosecution by their wrongful conduct in subjecting Plaintiff to the above. Defendants also intentionally caused Plaintiff emotional distress.

39.    Defendants instituted cruel and unusual punishment against Plaintiff by way of failing to properly investigate the conduct giving rise to his imprisonment, ignoring strong evidence that the crime was committed by another, and subjecting Plaintiff to prolonged incarceration for approximately four-years prior to trial so as to exert extraordinary leverage against Plaintiff to try and get him to plead to a criminal offense. Plaintiff was acquitted after only 90 minutes of deliberation by the jury following all evidence having been presented in trial that lasted over 30 days.

40.     Plaintiff was harmed from the time he was arrested through the time he was released from jail. Plaintiff lost his employment as a result of being incarcerated. Plaintiff also suffers substantial emotional stress, which is continuing and permanent.

41.     At the time of Defendants' investigation, Plaintiff had not committed any infraction giving rise to the probable cause/reasonable suspicion and/or to legally justify keeping Plaintiff in prison effectively without bail prior to being adjudicated by Defendants.

WHEREFORE, Plaintiff demands judgment against the Defendants, as follows:

      a.    Compensatory damages;

      b.    Punitive damages;

      c.    Reasonable attorney's fees and costs;

      d.    Such other and further relief as the Court deems necessary and just.

## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all issues in the above matter.

PINILISHALPERN, LLP
160 Morris Street
Morristown, New Jersey 07960
Telephone: (973) 401-1111
Facsimile: (973) 401-1114

Date: August 5, 2019

William J. Pinilis
wpinilis@consumerfraudlawyer.com